Hub Cloak & Suit Co., Inc. v. Commissioner. Harry Nathanson v. Commissioner.
Hub Cloak & Suit Co. v. Commissioner
Docket Nos. 36937, 36938.
United States Tax Court
T.C. Memo 1956-196; 1956 Tax Ct. Memo LEXIS 94; 15 T.C.M. (CCH) 1033; T.C.M. (RIA) 560196; August 28, 1956
*94 Held: 1. Petitioners have failed to upset the presumption of correctness adhering to respondent's determination of deficiencies for the taxable years involved. 2. A part of the deficiencies of both petitioners was due to fraud with intent to evade tax for the taxable years 1943, 1945 and 1946, but as to the taxable years 1944 and 1947 respondent has failed to sustain his burden of proving fraud by clear and convincing evidence. 3. The corporate petitioner failed to establish that its failure to file excess profits tax returns for its taxable years 1943 and 1945 was due to reasonable cause, and the addition to the tax pursuant to Section 291 of the Internal Revenue Code of 1939 was properly determined. 4. Additional Massachusetts excise taxes were erroneously allowed by respondent as an additional deduction in respect of the corporate petitioner, and additional deficiencies were properly sought by amended answer. 5. None of the deficiencies or additions determined by respondent are barred by virtue of the statute of limitations, Sections 275(a),276(a), 276(b), I.R.C. of 1939. Benjamin Tannenbaum, Esq., 350 5th Avenue, New York, N. Y., and Everett J. Slate, Esq., for the petitioners. *95 Joseph Landis, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion In Docket No. 36937, respondent determined deficiencies in income tax, declared value excess profits tax and excess profits tax of petitioner Hub Cloak & Suit Co., Inc., and additions to tax as follows: Income Tax
25% Addition
50% Addition
to Tax
to Tax
Sec. 291,
Sec. 293(b), Year
Deficiency
I.R.C. 1939
I.R.C. 1939
1943
$ 1,365.93
$ 682.96
1944
2,469.82
1,234.91
1945
2,650.85
1,325.42
1946
9,249.69
4,624.84
1947
2,726.77
1,363.38
$18,463.06
$9,231.51
Declared Value Excess Profits Tax
1943
$ 1,446.93
$ 723.46
1944
1,416.43
708.21
1945
2,514.86
1,257.43
$ 5,378.22
$2,689.10
Excess Profits Tax
1943
$ 3,905.69
$ 976.42
$1,952.84
1945
5,501.46
1,375.36
2,750.73
$ 9,407.15
$2,351.78
$4,703.57 In Docket No. 36938, respondent determined deficiencies in income tax of petitioner Harry Nathanson and additions to tax as follows: Income Tax
50% Addition
to Tax
Sec. 293(b) Year
Deficiency
I.R.C. 1939
1943
$ 1,332.72
$ 666.36
1944
1,950.38
975.19
1945
2,835.50
1,417.75
1946
8,541.52
4,270.76
1947
2,677.42
1,338.71
$17,337.54
$8,668.77
The issues, broadly stated, are (1) whether in the taxable years 1943 to 1947, inclusive, each petitioner realized income in excess of amounts reported; *96 (2) whether any part of any deficiency we may so determine was due to fraud with intent to evade tax; (3) whether the failure of the corporate petitioner to file an excess profits tax return for its taxable years 1943 and 1945 was due to reasonable cause; (4) whether additional Massachusetts excise taxes were improperly allowed to the corporate petitioner as an additional deduction, and (5) whether any deficiencies for any of the above taxable years are barred by the statute of limitations. A number of uncontested minor adjustments may be given effect in the computation pursuant to Rule 50. Findings of Fact A stipulation and supplemental stipulation filed by the parties and oral stipulations by counsel at the trial are incorporated by this reference as a part of these findings. Petitioner Hub Cloak & Suit Co., Inc. (hereinafter called "Hub"), is a corporation organized under the laws of the Commonwealth of Massachusetts. During all times material its issued and outstanding capital stock consisted of 40 shares of Class A voting stock and 60 shares of Class B nonvoting stock. All shares of both classes of stock were of the par value of $100 per share. Hub's income and declared value *97 excess profits tax returns for the calendar years 1943 to 1945, inclusive, and its income tax returns for 1946 and 1947 were filed on the cash receipts and disbursements basis with the collector of internal revenue for the district of Massachusetts, at Boston, Massachusetts. Hub did not file excess profits tax returns for the calendar years 1943, 1944 and 1945. Petitioner Harry Nathanson (hereinafter sometimes called "Harry") was at all times material president and treasurer of Hub. He owned 21 shares of Hub's Class A stock and all 60 shares of its Class B stock. His wife, Pearl Nathanson (hereinafter sometimes called "Pearl"), owned 17 shares of the Class A stock. The record does not disclose ownership of the remaining 2 shares of Class A stock. Harry's individual income tax returns for the calendar years 1944 to 1947, inclusive, and an individual income and victory tax return, Form 1040, in Harry's name for the year 1943 were filed with the collector of internal revenue for the district of Massachusetts at Boston, Massachusetts. I. Deficiencies of Hub and Harry Hub reported net income (loss) for the taxable years 1943 to 1947, inclusive, as follows: Year
Amount
1943
$ 400.27
1944
454.95
1945
660.55
1946
( 184.49)
1947
(1,893.37)
During *98 the same period Harry and Pearl separately reported gross income as follows: Amount Year
Harry
Pearl
1943
$2,340.00
*
1944
2,340.00
*
1945
2,340.00
$ 743.84
1946
2,180.00
711.09
1947
3,183.08
1,982.54
Respondent has determined that during each of the taxable years in issue Harry and Pearl made various expenditures, deposits and investments in amounts substantially exceeding receipts from all known sources, that Hub was the most likely source of such funds, and that such excess represented unreported income of Hub, which Harry, as the dominant figure in the enterprise, withdrew from the business. Accordingly, the Commissioner treated such excess amounts as understatements of net income by Hub, as well as distributions of dividends to Harry to the extent of Hub's available earnings and profits. With respect to Hub, respondent originally determined that its net sales were understated as follows: [1] *99 Net Sales
Understatement
Net Sales Year
as reported
determined
determined
1943
$112,042.88
$11,137.21
$123,180.09
1944
113,076.33
11,129.49
124,205.82
1945
123,497.28
19,433.55
142,930.83
1946
147,496.26
27,219.79
174,716.05
1947
131,376.84
15,113.68
146,490.62 At the opening of the trial respondent conceded that the foregoing understatements should be reduced by the following amounts: Year
Amount
1943
$2,517.02
1944
300.00
1947
1,750.00
Also, as a result of testimony at the trial, respondent now agrees that such alleged understatements should be further reduced for the years 1946 and 1947 in the respective amounts $900of and $750. Respondent's present position, reflecting the foregoing modifications, is that Hub's net sales were understated as follows: Year
Amount
1943
$ 8,620.19
1944
10,829.49
1945
19,433.55
1946
26,319.79
1947
12,613.68
While *100 respondent claims that Harry received distributions from Hub in the same amounts, he has, without expressly limiting his pleadings to a claim that such amounts were necessarily received as dividends, determined that Harry's unreported taxable income as a result of such distributions was in lesser amounts, as follows: Year
Amount
1943
$ 5,158.54
1944
7,355.53
1945
8,916.99
1946
22,353.50
1947
9,563.51
At all times material Hub was in the business of manufacturing and selling women's suits and coats. During the years 1943 to 1947, inclusive, it sold such garments to retail stores for resale (hereinafter referred to as "sales at wholesale"), and also directly to individuals for their own use (hereinafter referred to as "sales at retail"). Hub's books were kept under the direction or supervision of Harry at all times, except during the period January to April of 1946, when Harry was out of the United States. Hub's Federal income tax returns were all prepared by Harry or under his direction and supervision. Harry had completed a four-year course in accounting and was familiar with double-entry bookkeeping. Hub's books and records for the period 1943 to 1947, inclusive, are incomplete and inaccurate. *101 There were at least 40 sales at retail during this period which do not appear anywhere on Hub's books and were not reflected in its income. In many instances, groups of sales at retail were bunched together and written up in its books as sales at wholesale. Prices per garment were at least 20 per cent higher in sales at retail than in sales at wholesale. In addition the purchasers in sales at wholesale received discounts of three to ten per cent, whereas purchasers in sales at retail received no discount. Many invoices vital to the reconstruction of Hub's income for the years in question are missing. No invoices are available for 1943 and 1944 and a considerable number of invoices for 1945, 1946 and 1947 are likewise unavailable. And finally, the book introduced into evidence on Hub's behalf as its ledger is a different book from that which was represented by it to be its ledger to an accountant who made semi-annual audits of Hub's books over a 10-year period, which period included the taxable years involved herein. Saul Glazer (hereinafter called "Saul") was Pearl's father. He died testate on February 2, 1943. Upon his death Pearl received proceeds of insurance upon his life in the *102 amount of $5,167.02. Additional life insurance proceeds in the amount of $5,002.84 were left on deposit with the Union Central Life Insurance Company, and were not withdrawn prior to December 31, 1947. Pearl also succeeded to the entire interest in a savings account in the amount of $4,040 in the joint names of herself and Saul and to the entire interest in a joint checking account with a balance as of February 2, 1943, of $2,835.61. Saul also had a savings account in another bank in the joint names of himself and another daughter in the amount of $4,000, such other daughter similarly succeeding to the entire interest therein. All of the foregoing amounts to which Pearl succeeded, other than amounts unwithdrawn prior to December 31, 1947, have been taken into account and credited by respondent, and do not contribute to the amount determined by him to represent excess expenditures, investments and deposits by Pearl and Harry. Pearl, as executrix of Saul's estate, filed a sworn inventory wherein Saul's personal property, consisting of clothing and furniture, was assigned a value of $100. Two parcels of real estate were listed, one showing an equity of $9,500 and the other having no equity *103 over and above a mortgage in the amount of $12,256. No other assets were listed in the inventory. Saul filed no Federal income tax returns from 1929 to the time of his death. In January of 1943 Saul purchased a De Soto automobile, which the Nathansons used. Saul did not drive, but accompanied the Nathansons on trips. In 1947 they traded it in for a newer automobile. Clara Nathanson (hereinafter sometimes called "Clara") is Pearl's daughter. Saul's will, after stating that he had already made ample provision for both of his daughters, provided a specific bequest of $1 to each of them and then named Clara as residuary legatee. There were no other bequests or devises. The reference in the will of provision having been made for Saul's daughters related to the aforementioned joint bank accounts and policies of insurance upon Saul's life. The inventory filed by Pearl was substantially correct, and set forth the value of all assets belonging to Saul at the time of his death. It did not set forth any sums in respect of the joint bank accounts, because it was Pearl's understanding that such accounts automatically became the sole property of the survivor. The insurance proceeds were not included *104 therein because Pearl did not deem such proceeds part of Saul's estate. Saul did not have any other property or substantial cash on hand at the time of his death. Pearl, as executrix, sold Saul's personal effects from time to time, and turned over to Clara all amounts received therefor. Vacations by Pearl and Harry during the period 1943 to 1947, inclusive, included a trip to Panama and a trip to Florida. In each of the taxable years there nondeductible living expenses at least equalled their combined reported gross incomes less the sum of their actual disbursements for tax-deductible purposes plus Federal income taxes actually paid by them during each such year. During the years before us there were outstanding policies of insurance on Harry's life in a total face amount of no less than $30,000. Harry and Pearl paid premiums thereon, each paying premiums at different times. On at least one occasion Harry used funds belonging to Hub to pay such premiums, although Hub was not the beneficiary of any of such policies. Petitioners have failed to sustain their respective burdens of proving respondent's determination of deficiencies (apart from fraud) to be in error. Hub's net sales were *105 understated as follows: Year
Amount
1943
$ 8,620.19
1944
10,829.49
1945
19,433.55
1946
26,319.79
1947
12,613.68
Harry received from Hub, but failed to report or pay a tax upon taxable income in no less than the following amounts: Year
Amount
1943
$ 5,158.54
1944
7,355.53
1945
8,916.99
1946
22,353.50
1947
9,563.51
II. Fraud During the calendar years 1943, 1945 and 1946, checks were drawn by Harry on the bank account of Hub, and the proceeds used for Harry's own personal benefit. At Harry's direction the amounts thereof were charged to purchases on Hub's books and included in the cost of goods sold used in computing Hub's gross income stated on its returns for such years. Harry did not report such amounts as income in his invidual returns for those years. The amounts represented by such checks are as follows: 1943
$ 612.20
1945
240.00
1946
5,982.92
Harry was Hub's president and treasurer, and a graduate accountant. He was aware at all times material that expenditures for his own personal benefit could not properly be claimed by Hub for tax purposes as its own expenses, whether as an item in cost of goods sold or otherwise. He was also aware that expenditures of such nature represented taxable income to him and *106 should be reported as such in his individual returns. A part of the deficiencies of both taxpayers was due to fraud with intent to evade tax for the taxable years 1943, 1945 and 1946. Respondent has failed to sustain his burden of proving by clear and convincing evidence that any part of the deficiencies of either taxpayers was due to fraud with intent to evade tax for the taxable years 1944 and 1947. III. Twenty-five per cent Additions to Excess Profits Tax Hub failed to file excess profits tax returns for 1943 and 1945. Its income for those years, properly computed, required such filing. No reason for its failure so to file was offered at the trial. Hub has failed to sustain its burden of proving that its failure to file excess profits tax returns for its taxable years 1943 and 1945 was due to reasonable cause and not to wilful neglect. IV. Massachusetts Excise Tax In determining deficiencies against Hub, respondent allowed as a deduction additional Massachusetts excise tax as follows: Year
Amount
1943
$ 316.01
1944
307.94
1945
1,078.78
1946
1,428.46
1947
763.84
The amounts so allowed represent the estimated amounts of such tax based upon the additional income of Hub determined by respondent. *107 No part of such additional excise tax has been paid by Hub or demanded by authorities of the Commonwealth of Massachusetts. By amended answer respondent now claims that such allowance was erroneous and seeks increased deficiencies based on their disallowance. V. Statute of Limitations Agreements were executed from time to time between petitioners and respondent, pursuant to Section 276(b) of the Internal Revenue Code of 1939, extending the time within which respondent might assess taxes due, as follows: HUB Taxable
Date Agree-
Time Ex- Year
ment Executed
tended To
1944
March 8, 1948
June 30, 1949
March 7, 1949
June 30, 1950
June 28, 1950
June 30, 1951
March 12, 1951
June 30, 1952
1945
March 7, 1949
June 30, 1950
June 28, 1950
June 30, 1951
March 12, 1951
June 30, 1952
1946
March 10, 1950
June 30, 1951
March 12, 1951
June 30, 1952
1947
March 12, 1951
June 30, 1952
HARRY
1944
March 1, 1948
June 30, 1949
March 2, 1949
June 30, 1950
June 28, 1950
June 30, 1951
March 12, 1951
June 30, 1952
1945
March 2, 1949
June 30, 1950
June 28, 1950
June 30, 1951
March 12, 1951
June 30, 1952
1946
March 10, 1950
June 30, 1951
March 21, 1951
June 30, 1952
1947
March 12, 1951
June 30, 1952
For the taxable year 1943 Harry filed an individual income and victory *108 tax return, Form 1040, which was not signed on any part of the printed form. A schedule attached to the return, relating to travel and automobile expenses, was signed by Harry. The schedule does not expressly refer to the rest of the return, nor does Harry's signature thereon appear itself to have been sworn to or signed under the penalties of perjury. The notices of deficiency were sent to both petitioners on June 27, 1951. Jeopardy assessments were made by respondent against Harry on June 6, 1955, pursuant to Section 6861(a) of the Internal Revenue Code of 1954, as follows: Taxable
Income Year
Tax
Penalty
1943
$1,332.72
$ 666.36
1944
1,950.38
975.19
1945
2,835.50
1,417.75
1946
8,541.52
4,270.76
1947
2,677.42
1,338.71
Opinion RAUM, Judge: Respondent has determined that net sales of Hub were understated in substantial amounts for each of the taxable years 1943 to 1947, inclusive. He has accordingly determined deficiencies for each such year in income and declared value excess profits taxes. As a result of such deficiencies respondent has also determined that there are deficiencies in excess profits tax for 1943 and 1945, and that Hub's failure to file excess profits tax returns makes applicable the *109 25 per cent addition provided by Section 291 of the Internal Revenue Code of 1939. He has also determined that at least a part of each of the foregoing deficiencies was due to fraud with intent to evade taxes, and has imposed the 50 per cent addition authorized in case of fraud by Section 293(b) of the Internal Revenue Code of 1939. And finally, respondent has by amended answer claimed additional deficiencies as a result of the allowance as a deduction in the notice of deficiency of additional Massachusetts excise taxes not paid by Hub. Respondent has determined that in each of the taxable years 1943 to 1947, inclusive, Harry received from Hub far greater amounts of taxable income than he reported in his returns. He has taken the further position that the resulting deficiencies were due to fraud with intent to evade tax, and has applied the 50 per cent addition pursuant to Section 293(b) of the Internal Revenue Code of 1939. The issues are as follows: (1) Did respondent err in determining that Hub understated net sales during each of the taxable years 1943 to 1947, inclusive, and that Harry received from Hub during each of such years distributions taxable to him which he failed to *110 report as income? (2) Was any part of any such deficiency due to fraud with intent to evade tax? (3) Was Hub's failure to file excess profit tax returns for 1943 and 1945 due to reasonable cause? (4) Did respondent err in allowing as an additional deduction unpaid additional Massachusetts excise taxes? (5) Are any of the foregoing deficiencies barred by the statute of limitations? I. Deficiencies of Hub and Harry This issue is solely one of fact, and can be resolved only by examining all the evidence before us. The record is a most unsatisfactory one, and notwithstanding conscientious efforts by respondent's counsel to present a clear-cut picture, the evidence offered by petitioners was so confusing and elusive, and at times so lacking in credibility, that it raised more questions than it answered. We must conclude that petitioners have failed to carry their burden of proof. The sales records of Hub are not all available. Much which it claims would support its position is missing, and the records that are available show a false picture. For example, the evidence discloses that a considerable number of retail sales are totally absent from Hub's books, and we are not satisfied that *111 the profits attributable to such sales are otherwise accounted for. Petitioners contend that the proceeds of such sales were in fact accounted for in the following manner: Hub's books reflect a number of wholesale sales that were never in fact made, and the unrecorded retail sales were reflected in such fictitious wholesale sales. Petitioners argue that its books showed the fictitious wholesale sales in order to obtain more favorable treatment under existing O.P.A. price regulations in obtaining materials from suppliers. The evidence in this latter respect is far from satisfying, but, even assuming the existence of such a motive, it was not inconsistent with a companion motive to falsify the books in such manner as to reflect a smaller amount of income than was actually received. We are not at all convinced by the evidence that there were not additional unrecorded retail sales, or that the fictitious wholesale sales fully offset the unrecorded retail sales. The evidence as a whole, on this issue, is confusing and inconclusive; and petitioners' attempts to show income indirectly by evidence as to Hub's production through an examination of hypothetical labor costs were unconvincing, *112 since they were based upon factors that were too conjectural to be reliable. We conclude that petitioners have failed to carry their burden of proving the Commissioner to be in error. We cannot find from the record that respondent erred in determining deficiencies against Hub. During each of the taxable years 1943 to 1947, expenditures, investments and deposits by Harry and Pearl far outstripped all of their available resources with the exception of Hub. Respondent has determined that such excess of expenditures, investments and deposits represent amounts received from Hub, and that of such amounts a part thereof constituted taxable income to Harry. Amounts determined to represent Harry's taxable income from distributions by Hub are substantially less than the total amounts claimed by respondent to represent distributions to Harry. While respondent has not limited the issue by his pleadings to whether Harry received from Hub additional income specifically as dividends he has computed the amounts of additional income taxable to Harry in accordance with Hub's earnings and profits, thus arriving at the smaller amounts in respect of Harry. Petitioner Harry complains that Pearl was also *113 a stockholder of Hub, and that respondent failed to attribute to her any part of its unreported distributions. There is no merit in such contention. Even were we to view distributions to Harry as dividends if taxable at all, it is of no moment that Pearl is also a stockholder. Petitioner bears the burden of proving respondent to be in error. He has not convinced us that in fact Pearl rather than Harry did receive any part of the distributions. That some of the expenditures and investments may have been made by her does not establish her as the recipient of a distribution by Hub. The rentals with which respondent credited petitioners were credited on the theory that they belonged to and were received by Pearl, rather than to Harry. They are substantial in amount, and could easily account for any expenditures established by the record herein to have been made made by Pearl. Harry dominated Hub, and it is well settled that dividends, for purposes of the Federal income tax, need not be proportional to shares held, or be paid to all shareholders. Cf. Regensburg v. Commissioner, 144 Fed. (2d) 41, 44 (C.A. 2), certiorari denied, 323 U.S. 783; Cleveland Shopping News Co. v. Routzahn, 89 Fed. (2d) 902, 903 *114 (C.A. 6); 58th Street Plaza Theatre, Inc., 16 T.C. 469, 477, affirmed, 195 Fed. (2d) 729 [724] (C.A. 2), certiorari denied, 344 U.S. 820; Ben R. Meyer, 45 B.T.A. 228, 241. Harry has attempted to defeat respondent's determinations by showing additional sources of nontaxable receipts, and assets on hand as of the beginning of the taxable period in question. He claims that in addition to funds for which respondent allowed him credit, there should have been allowed the following: Year
Designation
Amount
1943
Proceeds from Sale of furni-
ture (Saul's)
$ 200.00
1943
Loan repaid by Weiner
300.00
1943
Loans repaid by Gussie
110.00
1943
Loan repaid by Shoul
500.00
1943
Loan repaid by Feldman
500.00
1943
Loan repaid by Rosenberg
636.00
1944
Proceeds from Sale of furni-
ture
500.00
1944
Loan repaid by Davis
27.00
1944
Loan repaid by Feldman
175.00
1944
Loan repaid by Jordan
100.00
1944
Loan repaid by Gorin
117.50
1944
Loan from Hub to Harry
300.00
1945
Proceeds from Sale of furni-
ture
$ 450.00
1945
Reported income of Pearl
743.86
1945
Checks used to pay for real es-
tate
4,086.00
1945
Loan repaid by Segal
1,000.00
1946
Proceeds from Sale of furni-
ture
711.19
1946
Reported income of Pearl
350.00
1946
Payment for bungalow by
Shaff
500.00
1946
Payment for bungalow by
Schwartz
400.00
1947
Reported income of Pearl
1,982.54
1947
Payment for car by Schwartz
750.00
1947
Loan repaid by Shaff
181.15
1947
Loan repaid by Rosenberg
636.00
1947
Loan repaid by Charlie
165.48
1947
Loan repaid by Sam L.
70.00
1947
Loan repaid by Charlie
138.91
1947
Loans repaid by Edith
250.00
1947
Loans by Hub to Harry
825.00
*115 Paragraph 18 of the Stipulation of Facts herein, in setting forth excess amounts of deposits, purchases and investments by the Nathansons over various sources of funds for such deposits, purchases and investments, provides that, among other items taken into account by respondent in making such computations were: "Loans to Harry or Pearl, loans repaid to Harry or Pearl (including, but not limited to, those referred to in paragraph 12 hereof) * * *." At the trial of this action there was considerable disagreement between counsel as to the extent to which certain facts had been stipulated. As indicated at the trial, we intend that both parties shall be bound by the stipulation, supplemental stipulation and oral additions to the stipulations, and we will not find facts inconsistent therewith. We are satisfied that the meaning of paragraph 18 of the stipulation is that respondent has, in making his computations, given credit for all loans made during the taxable years to either Harry or Pearl and also for all amounts paid to either of them as repayments of loans during the same period. The above items designated as loans by Hub to Harry are clearly within the stipulation and we will not *116 accept proof of additional such loans in derogation thereof, particularly where the "proof" was far from convincing. The situation might be different if the proof were clear, for in such circumstances we might conceivably give relief from an improvident stipulation. The rest of the above items respecting various loans allegedly repaid must similarly be denied any status as additional nontaxable receipts. If it is the contention of petitioners that these were loans repaid to Hub through Harry, then we must reject such contention as not being established by the record to our satisfaction. Hub's books do not by themselves appear to sustain such contentions, and we do not believe that Harry's testimony with respect thereto was accurate. If, on the other hand, the above items are claimed as loans made by Harry and repaid to him, they are within the scope of paragraph 18 of the stipulation and have, according to that paragraph, already been taken into account. We are satisfied that Saul's furniture was worth no more than $100 at the time of his death. We do not believe that any greater sum was realized as a result of its sale. There is before us no credible evidence of the amount actually *117 received or the year in which it was received. We cannot alter respondent's computations as a result of this item. While the reported income of Pearl was not taken into account, neither did respondent add to Harry's taxable income any amount because of nondeductible personal living expenses. We are not satisfied that such expenses did not at least equal the combined reported incomes of Pearl and Harry during each of the taxable years before us. Thus, we cannot find any error or exclusiveness in respondent's computations because of the omission of Pearl's reported income. As to the $4,086 item described by petitioners as "checks used to pay for real estate", the record is far from clear, and we are not convinced that respondent committed any error in respect thereof. We are satisfied that in fact Harry received $900 in 1946 on account of a bungalow and $750 in 1947 from the sale of a car, as nontaxable receipts which respondent erred in failing to take into account. However, respondent has conceded both of these items on brief, and they represent adjustments to his computations. Certain additional assets were in fact in the Nathansons' hands as of January 1, 1943. Their mere existence, *118 however, without evidence that they were liquidated or otherwise dealt with in such manner during the years in issue as to be available for expenditures, investments or deposits does not detract from respondent's computations. They were not treated by respondent as representing acquisitions during the relevant period. To the extent they do not appear on one side of the equation, they need not, in fact must not, appear on the other side. We do not find from the record that those assets were in fact sold, withdrawn, cashed or repaid during the taxable years before us, and are not convinced that the omission by respondent of any reference thereto constituted error. Finally, much reliance is placed by petitioner upon testimony by Pearl of assets allegedly coming into her hands at the death of her father. We do not believe such testimony. The record shows only that at various times long before the period in issue, Saul owned assets of substantial value. Such evidence, however, is so remote in time that we do not find it persuasive. There is no credible evidence of the state of Saul's wealth at any time reasonably proximate to January 1, 1943, or to February 2, 1943, when he died, [2] other *119 than evidence damaging to petitioners' contentions. Pearl, as executrix, filed a sworn inventory, listing Saul's assets as clothing and furniture of the value of $100 and real estate with a total equity of $9,500. We are satisfied that the inventory so filed was a true and correct statement by Pearl of Saul's assets. Apart from various joint bank accounts totalling approximately $11,000, and whatever cash surrender value, if any, he may have owned in policies of insurance on his life, Saul, immediately prior to his death did not own assets in addition to or of a greater value than that sworn to by Pearl in the foregoing inventory. We note in this respect that, despite testimony that Saul's income was at least $5,500 per year for a substantial number of years up to the time of his death, he never filed a Federal income tax return at any time from 1929 to the date of his death. Pearl testified that on Saul's death there was $50,000, more or less, in cash in a safe in *120 his apartment, which she considered as belonging to her, because of alleged oral statements made to her by Saul. Such unproductive hoarding of money during the period of rising values immediately prior to Saul's death is entirely inconsistent with the picture otherwise painted for us of lifelong substantial investment activity on his part. Her explanation of this alleged hoarding is unacceptable. She testified that Saul was distrustful of banks. Yet at his death there were accounts in the joint names of himself and his daughters totalling approximately $11,000. Pearl, however, admittedly had no fear or distrust of banks, and we cannot accept as true her uncorroborated story that it took her four to five years to deposit the money in various bank accounts. Furthermore, in order to accept as true the story of Saul's savings and his accumulated wealth at the time of his death, we would, in effect, have to believe that Pearl as executrix swore to a false inventory, [3] and that Saul, although experienced in business, was guilty of a failure to file income tax returns over a period covering many taxable years. We will not be so easily led into accepting as true claims of conduct bordering *121 dangerously close to fraudulent and perhaps criminal, without stronger evidence to that effect than is now before us. We are not convinced by the record of the existence of any errors in respondent's computations of excess investments by the Nathansons other than the foregoing items of $900 for 1946, and $750 for 1947. Respondent's determinations of deficiencies against Harry are accordingly sustained. II. Fraud Respondent bears the burden of proving fraud by clear and convincing evidence. The mere fact that we have sustained basic deficiencies does not supply this proof or relieve respondent of the necessity of sustaining his burden. This is particularly true where such deficiencies have been sustained largely because of a failure on the part of the petitioners to sustain their respective burdens of proof. Drieborg v. Commissioner, 225 Fed. (2d) 216, 218 (C.A. 6). The stipulated facts, however, show that in 1943, 1945 and 1946, Harry drew checks upon Hub's bank account, and used the proceeds for his *122 own personal benefit. He caused these amounts to be charged on Hub's books to purchases and reflected in the cost of goods sold on Hub's returns. Harry had completed a four-year course in accounting, and was familiar with doubleentry bookkeeping. Hub's books were kept by him or under his direction and supervision, and its returns were prepared by him or at his direction. We cannot but be amply convinced that Harry was well aware that amounts spent by him for purposes personal to himself were not proper items of expense for Hub. Concededly, it is at times doubtful and subject to honest differences of opinion as to whether a particular expenditure is personal to an officer and stockholder, or is a proper business expense of a corporation. But Harry could not conceivably have honestly thought an expense which he now concedes was personal to have been properly attributable to purchases by Hub and a part of the cost of goods sold used in determining gross income. Likewise, we are well satisfied that Harry knew only too well that expenditures in his own behalf by Hub constituted distributions taxable to him. And we cannot believe that such conduct in three different taxable years could *123 have been the result merely of carelessness or inadvertence. Harry's failure to report and pay a tax upon the amounts of such expenditures constituted fraud with intent to evade tax for the taxable years 1943, 1945 and 1946. Harry was Hub's president and treasurer. His actions in charging such amounts to purchases and causing them to be reflected as a part of the cost of goods sold was in his capacity as such officer, and as its dominant stockholder, and were in contemplation of law Hub's actions. The foregoing satisfies our requirement that there be clear and convincing evidence of fraud. For 1943, 1945 and 1946, Hub was accordingly guilty of fraud with intent to evade tax with respect to at least a part of the deficiencies for those years. The 50 per cent additions determined by the respondent with respect to those three taxable years are sustained as to both petitioners. A review of the entire record fails to satisfy us, however, that, apart from the foregoing, respondent has shown by clear and convincing evidence that either Hub or Harry was guilty of fraud with intent to evade tax; and since the foregoing relates only to the years 1943, 1945 and 1946, we must conclude that respondent *124 has not carried his burden as to 1944 and 1947. Accordingly, the 50 per cent additions cannot be sustained for 1944 and 1947. III. Twenty-five Per Cent Additions to Excess Profits Tax Respondent has determined 25 per cent additions pursuant to Section 291 of the Internal Revenue Code of 1939 with respect to deficiencies in excess profits taxes of Hub for 1943 and 1945, as a result of Hub's failure to file excess profits tax returns for those years. In order to escape such additions, Hub must show that its failure to make and file such returns was due to reasonable cause and not to wilful neglect. Petitioner bears the burden of proving reasonable cause. Cf. Vern W. Bailey, 21 T.C. 678, 687; Marcia P. Pierson, 21 T.C. 826, 828. Hub has failed to sustain this burden and the determination of the foregoing addition to the tax must be sustained. IV. Massachusetts Excise Tax Respondent, in determining the various deficiencies against Hub, first allowed as an additional deduction the amount of estimated additional Massachusetts excise taxes, based upon the amounts determined by respondent as additional income of Hub in the taxable years involved. By amended answer, respondent alleges such *125 allowance to have been erroneous, and asks for additional deficiencies based upon the disallowance of such amounts previously allowed by him as additional deductions. [4] *126 Hub is a cash basis taxpayer. It may therefore deduct for any given taxable year only those taxes it in fact paid during such year. Cf. Eugene Vassallo, 23 T.C. 656, 664. Hub did not pay any additional Massachusetts excise tax during the years in issue. It is not entitled to deduct such amounts, and respondent erred in permitting it to do so. His request for increased deficiencies must be sustained. V. Statute of Limitations Both petitioners pleaded the statute of limitations, Section 275(a), Internal Revenue Code of 1939, as a bar to all deficiencies determined by respondent. However, there are various agreements covering the taxable years 1944 to 1947, inclusive, of each petitioner, which extend the time within which additional taxes due for those years might be assessed to periods subsequent to the date of the mailing of the notices of deficiency. Petitioners do not challenge the validity or the fact of execution of such agreements, and we must hold that they conclusively settle this issue in respondent's favor with respect to those years. Section 276(b), Internal Revenue Code of 1939. *127 The agreements cover every type of deficiency determined by respondent against each respective taxpayer, and there remains for consideration only the taxable year 1943, with respect to which there was no such agreement or waiver of the statute of limitations. Our determinations of fraud on the part of both petitioners for the year 1943 make inapplicable the statutory bar. Section 276(a), Internal Revenue Code of 1939. Furthermore, petitioner Hub did not file an excess profits tax return for 1943. The foregoing makes it unnecessary to determine whether Harry's Form 1040 for 1943 was a proper return. We therefore hold that none of the deficiencies determined by respondent against either petitioner herein is barred by the statute of limitations. Decisions will be entered under Rule 50. Footnotes
*. No return filed.↩
1. The understatements were determined on the basis of expenditures, deposits, and investments made by Harry and Pearl, after giving them credit for all known sources of funds which could have been used for such purpose. Among such known sources were substantial amounts of rentals received during each of the years. Respondent apparently is willing to treat such rentals as having been received by Pearl from property separately owned by her, hence not chargeable to Harry as additional unreported distributions from Hub, or to Hub as additional understatements of net sales. Although it is clear from her returns that Pearl did not report such amounts, she is not a petitioner herein, and the propriety of her failure to do so is not at issue in these proceedings.
2. Testimony with respect to Saul's wealth on the part of Ernesto Branca described as a lifelong friend and confident of Saul, was based in large part if not entirely upon inadmissible hearsay and is of little or no value.↩
3. Pearl's testimony of her familiarity with Saul's affairs would seem to preclude the possibility that ignorance of the facts could be the cause of so flagrantly erroneous an inventory.↩
4. Chapter 63, Section 32, of the General Laws of Massachusetts requires the annual payment by every domestic business corporation of an excise tax based upon its net income, which is to be determined in accordance with rules set forth in various sections thereof. Section 36 provides for the payment of additional excise tax in case of the correction of net income for purposes of the Federal income tax in the following language: Correction of Return; Additional Tax. - Any final determination of the federal net income made pursuant to the provisions of federal law under which such net income is found to differ from the net income originally reported to the federal government shall be reported by the corporation to the commissioner within seventy days of receipt by it of notice of such final determination, with a statement of the reasons for the difference, * * * If * * * it shall appear that the tax * * * assessed by this chapter has not been fully assessed, the commissioner shall * * * assess the deficiency * * * and the tax so assessed shall be payable thirty days from the date of notice to the corporation of such assessment * * *